UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| DALE LANGSTON | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | |
| | § | CIVIL ACTION NO. 4:13-cv-3035 |
| SAN JACINTO JUNIOR COLLEGE, | § | |
| ET AL., | § | |
| | § | |
| Defendants. | § | |

## MEMORANDUM AND ORDER

Plaintiff Dale Langston has filed this lawsuit pursuit to 42 U.S.C. § 1983, alleging retaliation in contravention of the First Amendment and a violation of his Fourteenth Amendment right to due process. He also alleges that rights guaranteed by the Texas state constitution have been abridged. Plaintiff has brought suit against San Jacinto Junior College ("Defendant," "San Jac," or "the College"), his former employer, Bill Miller, his former boss, and Brenda Hellyer, the College's chancellor. Now pending is Defendants' Motion to Dismiss brought pursuant to Federal Rule of Civil Procedure 12(b)(6). After considering the Motion, all responses and replies, and the applicable law, the Court concludes that the Motion should be **GRANTED**.

**I.   BACKGROUND**[1]

San Jacinto Community College is a public community college located in Pasadena, Texas. (Doc. No. 1-1 ¶ 2.) Plaintiff alleges that, in recent years, the college's facilities have begun to "show effects of corrosion." (*Id.* ¶ 13.) He notes, for instance, that a September 2006

---

[1] For the purposes of a motion to dismiss, the Court takes Plaintiff's factual allegations as true. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007).

report identified corrosion in the College's Central Campus Pipe System and that more of the same was discovered in November of that year. (*Id.* ¶¶ 14, 16.) The physical plants that were falling into decay were supervised by Ron Rucker and Bill Miller. (*Id.* ¶ 17.)

Langston was hired in 2007 and charged with overseeing the college's HVAC systems, implementing preventive maintenance for all campuses and offices, and supervising a staff of eleven. (*Id.* ¶ 20.) Almost immediately upon being hired, Langston noticed that the Central Campus air handlers had fallen into premature disrepair, that San Jac's Mechanical Engineer knew about the problem but had not fixed it, and that the issue posed immediate safety risks. (*Id.* ¶¶ 21-23.) Langston drafted a letter to Underwriter's Laboratory and other involved parties "to enforce the vendor's replacement of the defective machines" but Miller would not permit Langston to send the letter. (*Id.* ¶ 24.) Miller also rejected Langston's suggestion for how best to fix the machines and instead asked an employee "to simply band the cracked metal shells of the air handlers." (*Id.* ¶ 25) He said that the air handlers would not be replaced until another bond election had taken place. (*Id.*)

In response, Langston told Miller that the air handlers posed a significant risk to life and that "the vendor should be held responsible because the air handlers were clearly failing due to defective construction materials." (*Id.* ¶ 26.) Miller informed Langston that his decision was final and Langston abided by that decision. (*Id.* ¶¶ 26-27.) At the end of the year, Langston received an "outstanding" performance review. (*Id.* ¶ 28.)

Langston continued to identify poorly engineered and defective components within the HVAC system, but Miller "was not appreciative." (*Id.* ¶¶ 29-30.) Langston supervised the remediation of any problem he discovered in his area of responsibility, but Miller was placing

"monkey wrenches" to keep Langston from doing job. (*Id.* ¶¶ 31-32.) Langston believed that Miller was trying to conceal fraud, waste, and/or inefficiency. (*Id.* ¶ 33.)

Langston spoke to Miller about his lack of cooperation, but Miller demurred. (*Id.* ¶ 34.) Langston reported the issues to Don Nethertou, the College's Director of Maintenance. (*Id.* ¶ 35.) Langston was then "suddenly and falsely cited by Miller's supervisor, Rou Rucker, for allegedly causing two employees to become ill from exposure to air conditioning refrigerant." (*Id.* ¶ 36.) Believing the allegations to be unfounded, and the illnesses fabricated, Langston disputed that charge. (*Id.* ¶ 37.)

Langston took a leave of absence to care for his injured wife in April 2009, and upon returning to work, he learned that the air handlers had failed. (*Id.* ¶¶ 38-39.) He continued to "identify haphazard procurement and work," becoming "an apparent thorn in the side of Rucker and Miller." (*Id.* ¶ 40.) Perhaps as a result, he was falsely accused of being involved in the theft of a motorcycle and had his work truck reassigned. (*Id.* ¶¶ 41-42.) Undaunted, Langston continued to locate malfunctioning equipment and arrange for its maintenance. (*Id.* ¶ 43.)

On July 25, 2010, Langston reported that "substandard work . . . had been deliberately performed contrary to his instructions." (*Id.* ¶ 44.) He also realized that the College's annual water treatment costs, paid to a company called NALCO, had increased from $28,000 to $200,000. (*Id.* ¶ 45.) And, he learned that the College's air handling units were being faultily repaired by Gurry Air Conditioning, the College's vendor contractor. (*Id.* ¶ 46.) Langston believed "[t]he 'repairs' were not up to any reasonable specification of either product standard or remediation of defects, with metal block fractures being repaired with metal-bands and ratchet binders purchased from Harbor Freight supplier instead of welded metal strips." (*Id.* ¶ 47.)

Langston reported those facts, which he believed to be indicative of "waste and inefficiency" to Miller — who Langston believed to be a friend of Gurry Air Conditioning's Chuck Prangle — but Miller ignored that report. (*Id.* ¶ 48.) Langston then forwarded his report, along with photographs of the equipment and what he believed to be sham repairs, to the College's Associate Vice Chancellor for Facilities and Construction, Bryan Jones. (*Id.* ¶ 49.) Soon thereafter, the College terminated its contract with Gurry Air Condition. (*Id.* ¶ 50.)

Langston "began to draw heightened criticism from Miller, who announced he was going to retire." (*Id.* ¶ 51.) Rucker was promoted as a result. (*Id.* ¶ 52.) On July 19, 2011, Langston was terminated. (*Id.* ¶ 53.) Langston has alleged that similar maintenance and facility problems persisted after he was fired. (*Id.* ¶¶ 56-60.)

Langston filed this suit in the 215th District Court of Harris County in February 2013. (Doc. No. 1-1 at 2.) After Langston had twice amended his petition, Defendants removed to this Court in October 2013. (Doc. No. 1.) Langston asserts that "[t]he circumstances and timing clearly establish that [he] was terminated for having raised concerns about Gurry Air Conditioning and other poor maintenance issues." (Doc. No. 1-1 ¶ 54.) He says that he "spoke out within the chain of command to protect the taxpayer's investments at San Jac" and that "[b]ecause of those expressions, he stepped on [the] toes of Rucker and Miller who had an apparent investment in keeping San Jac's vendors in place and not rocking the San Jac administrative boat." (*Id.* ¶¶ 61-62.) He adds that he "was harassed and terminated in order to obstruct his disclosure of Ricker's and Miller's poor oversight of waste and inefficiency in the expenditure of public monies." (*Id.* ¶ 63.)

This Motion was filed on February 2, 2014. (Doc. No. 5.)

4

## II.     LEGAL STANDARD

A court may dismiss a complaint for a "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). "To survive a Rule 12(b)(6) motion to dismiss, a complaint 'does not need detailed factual allegations,' but must provide the plaintiff's grounds for entitlement to relief — including factual allegations that when assumed to be true 'raise a right to relief above the speculative level.'" *Cuvillier v. Taylor*, 503 F.3d 397, 401 (5th Cir. 2007) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). That is, a complaint must "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570). A claim has facial plausibility "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). The plausibility standard "is not akin to a 'probability requirement,'" though it does require more than simply a "sheer possibility" that a defendant has acted unlawfully. *Id.* Thus, a pleading need not contain detailed factual allegations, but must set forth more than "labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555 (citation omitted).

Ultimately, the question for the court to decide is whether the complaint states a valid claim when viewed in the light most favorable to the plaintiff. The court must accept well-pleaded facts as true, but legal conclusions are not entitled to the same assumption of truth. *Iqbal*, 556 U.S. at 678-79 (citation omitted). The court should not "'strain to find inferences favorable to the plaintiffs'" or "accept 'conclusory allegations, unwarranted deductions, or legal conclusions.'" *R2 Invs. LDC v. Phillips*, 401 F.3d 638, 642 (5th Cir. 2005) (quoting *Southland Sec. Corp. v. Inspire Ins. Solutions, Inc.*, 365 F.3d 353, 361 (5th Cir. 2004)). Importantly, the

court should not evaluate the merits of the allegation, but must satisfy itself only that the plaintiff has adequately pled a legally cognizable claim. *United States ex rel. Riley v. St. Luke's Episcopal Hosp.*, 355 F.3d 370, 376 (5th Cir. 2004).

### III.  ANALYSIS

#### A. First Amendment

The Supreme Court "has made clear that public employees do not surrender all their First Amendment rights by reason of their employment. Rather, the First Amendment protects a public employee's right, in certain circumstances, to speak as a citizen addressing matters of public concern." *Garcetti v. Ceballos*, 547 U.S. 410, 417 (2006). The Fifth Circuit employs a four-pronged test to determine whether a public employee's speech is entitled to First Amendment protection. *Gibson v. Kilpatrick*, 734 F.3d 395, 400 (5th Cir. 2013) (citing *Juarez v. Aguilar,* 666 F.3d 325, 332 (5th Cir. 2011)). "A plaintiff must establish that: (1) he suffered an adverse employment decision; (2) his speech involved a matter of public concern; (3) his interest in speaking outweighed the governmental defendant's interest in promoting efficiency; and (4) the protected speech motivated the defendant's conduct." *Id.*

With respect to the second prong (which is all that Defendants have challenged here), under *Garcetti*, "before asking whether the subject-matter of particular speech is a topic of public concern, the court must decide whether the plaintiff was speaking 'as a citizen' or as part of her public job. Only when government penalizes speech that a plaintiff utters 'as a citizen' must the court consider the balance of public and private interests, along with the other questions posed by [*Pickering v. Board of Educ*., 391 U.S. 563 (1968)] and its successors, such as *Waters v. Churchill,* 511 U.S. 661 [] (1994); *Connick v. Myers,* 461 U.S. 138 [] (1983); and *Givhan v. Western Line Consolidated School District,* 439 U.S. 410 [] (1979)." *Davis v. McKinney*, 518

F.3d 304, 312 (5th Cir. 2008) (internal quotation marks omitted). The Court therefore turns first to whether Plaintiff here spoke 'as a citizen' or as a part of his public job; that is a question of law, *id.* at 315.

"Cases from other circuits are consistent in holding that when a public employee raises complaints or concerns up the chain of command at his workplace about his job duties, that speech is undertaken in the course of performing his job." *Id.* at 313 (citing *Spiegla v. Hull*, 481 F.3d 961, 966 (7th Cir. 2007); *Battle v. Bd. of Regents*, 468 F.3d 755, 761 (11th Cir. 2006); *Foraker v. Chaffinch*, 501 F.3d 231 (3d Cir. 2007)). On the other hand, if "a public employee takes his job concerns to persons outside the work place in addition to raising them up the chain of command at his workplace, then those external communications are ordinarily not made as an employee, but as a citizen." *Id.* (citing *Freitag v. Ayers,* 468 F.3d 528 (9th Cir. 2006)).

In *Davis*, where the court found that speech related to her "core job description" and was sent "up the chain of command seeking redress for what she felt was an inadequate response to the findings of her investigation," the court found that the plaintiff had spoken as an employee. *Id.* at 315. In contrast, where plaintiff's speech had "nothing to do with her job function," the court found that she had spoken as a citizen. *Id.* at 316. The court struggled with speech that was made on a subject relevant to the plaintiff's core job duties, but which was directed to the university system's chancellor, who was *several* levels up the chain of command. Ultimately, because the court's "review of the record reveal[ed] that Chancellor Yudof was indisputably within Davis' chain of reporting responsibilities on internal audit issues," it determined that *Davis* had spoken as an employee. *Id.* at 315-16.

It is clear from the face of Plaintiff's petition that his case cannot go forward. First, Langston has acknowledged in his Petition that he "spoke out within the chain of command"

7

when he reported faulty repairs to his immediate supervisors and a more senior manager in charge of facilities. (Doc. No. 1-1 ¶ 61.) He made a similar concession in his briefing. (Doc. No. 9 at 14.) The cases are quite clear that raising concerns up the chain of command is not protected by the First Amendment. Moreover, Langston's complaints about outside contractors poorly repairing air handlers[2] seem unambiguously within "the subject matter of his employment." *Petrie v. City of Grapevine*, 904 F. Supp. 2d 569, 577 (N.D. Tex. 2012) *aff'd sub nom. Petrie v. Salame*, 546 F. App'x 466 (5th Cir. 2013). That he spoke on a matter of which he had "special knowledge" as a result of his duties further supports this conclusion. *Williams v. Dallas Indep. Sch. Dist.*, 480 F.3d 689, 694 (5th Cir. 2007). That the speech at issue was not "demanded" of him by his employer does not suggest otherwise. *Id.*

    Langston's pleas for First Amendment protection ring hollow. (Doc. No. 9 at 16.) It does not matter that he spoke in order "to protect taxpayer investments" or that paying for shoddy repairs amounted, in his view, to "[w]asteful expenditures of public dollars." (Doc. No. 9 at 16.) Nor does it alter the Court's analysis that he believed his speech "threatened Miller's apparent investment in maintaining the status quo relationship with vendors." (*Id.*) Ultimately, these arguments boil down to a contention that his "speech [wa]s of great social importance" and even speech of that sort "is not protected by the First Amendment so long as it was made pursuant to the worker's official duties." *Williams*, 480 F.3d at 692. The bottom line is that Langston spoke about the very systems that he was hired to oversee; speech of that sort is quite

---

[2] (*See* Doc. No. 1-1 ¶¶ 46-48, 54.)

clearly related to his core job description.[3]  As such, the Motion to Dismiss Plaintiff's First Amendment claim is **GRANTED**.

### B. Due Process

"To show a due process violation in the public employment context, the plaintiff must first show that she had a legally recognized property interest at stake." *Lollar v. Baker*, 196 F.3d 603, 607 (5th Cir. 1999). "A public employee has a property interest in her job if she has a legitimate claim of entitlement to it, a claim which would limit the employer's ability to terminate the employment." *Johnson v. Sw. Mississippi Reg'l Med. Ctr.*, 878 F.2d 856, 858 (5th Cir. 1989); *see also Whiting v. Univ. of S. Mississippi*, 451 F.3d 339, 344 (5th Cir. 2006) ("The person must have a legitimate claim to those benefits, not simply an abstract need or unilateral desire."). Whether a public employee has such an interest turns on state law, because "'[t]he Constitution does not create property interests; they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law.'" *Lollar*, 196 F.3d at 607 (quoting *Schaper v. City of Huntsville*, 813 F.2d 709 (5th Cir. 1987)). "A claim of entitlement to job tenure may be created directly by state statute or by a written contract, or by a 'mutually explicit understanding' enforceable under state law as an implied contract." *Johnson*, 878 F.2d at 858 (quoting *Perry v. Sindermann*, 408 U.S. 593, 601-02 (1972)).

"For well over a century, the general rule in this State, as in most American jurisdictions, has been that absent a specific agreement to the contrary, employment may be terminated by the employer or the employee at will, for good cause, bad cause, or no cause at all." *Montgomery Cnty. Hosp. Dist. v. Brown*, 965 S.W.2d 501, 502 (Tex. 1998). "An agreement to modify the at-

---

[3] Plaintiff alleges that he "noticed" that the annual cost of San Jac's water treatment "had soared." (Doc. No. 1-1 ¶ 45.) Whether a report on that issue concerned the subject matter of his employment would have been a more challenging question, but the Court need not answer it, because Plaintiff has not alleged that he alerted anyone to that observation.

will employee status must be clear and explicit." *Cote v. Rivera*, 894 S.W.2d 536, 540 (Tex. App.-Austin 1995) (citing *Martinez v. Hardy,* 864 S.W.2d 767, 775 (Tex. App.-Houston [14th Dist.] 1993, no writ)).

Defendants argue that "Langston's due process argument is fundamentally flawed because he fails to identify any policy, agreement, or law that actually restricted the College's right to terminate his employment." (Doc. No. 10 at 7.) In his Brief in Opposition to the Motion to Dismiss, Langston points to the College's policies, procedures, and guidelines as expressed on its web site and argues that his employment was subject to those strictures, which San Jac purportedly violated when it terminated Plaintiff for calling his superiors' attention to suspected fraud. (Doc. No. 9 at 21.) The Court has grave doubts regarding whether these policies could possibly be sufficient to alter the terms of his employment, as Texas courts have rejected reliance on, for example, grievance policies that did not explicitly set up processes for discharge, *Renken v. Harris Cnty.*, 808 S.W.2d 222, 225 (Tex. App.-Houston [14th] 1991), a city charter's commitment not to discriminate, *Saucedo-Falls v. Kunkle*, 299 F. App'x 315, 320 n.21 (5th Cir. 2008), and an employee handbook that "grants certain 'rights' to employees," *Guinn v. Bosque Cnty.*, 58 S.W.3d 194, 201 (Tex. App.-Waco 2001).

But Plaintiff has a more fundamental problem, which is that he has not actually included in his Petition any allegations about the terms of his employment. While it is a legal question whether Plaintiff had a protected property interest, Plaintiff must plead facts that allow the Court to make that determination. He has not. The "Facts" section of his Petition contains no information about the terms of his employment; the paragraph in his "Cause of Action" section that sets forth his due process claim states only that "Defendants have acted to deprive Plaintiff . . . of protected interests without due process." (Doc. No. 1-1 ¶ 70.) The Complaint is devoid of

10

any allegations regarding the college's policies, procedures, and guidelines and how they may have "clearly and explicitly" altered the terms of Plaintiff's employment. It is not enough for Plaintiff to clarify the nature of his allegations in his briefs; "it is axiomatic that the complaint may not be amended by the briefs in opposition to a motion to dismiss." *Roebuck v. Dothan Sec., Inc.*, 515 F. App'x 275, 280 (5th Cir. 2013) (internal quotation marks omitted). The Court is also disinclined to take judicial notice of the college's web site; allowing a claim to survive a motion to dismiss based *exclusively* on facts not contained within the live complaint stretches judicial notice beyond recognition.[4]

Without anything in the pleadings that speaks to the nature of Plaintiff's employment relationship with the College, the Court must **GRANT** the Motion to Dismiss the due process claim.

### C. State Law Claims

Plaintiff seeks a declaration under the Texas Uniform Declaratory Judgment Act that his state constitutional rights were violated. (*See* Doc. No. 1-1 ¶ 68, 70.) Much of the briefing focuses upon whether such claims are barred by sovereign immunity, but the Court does not reach that issue.[5] Even if such claims were not prohibited on immunity grounds, Plaintiff has not offered any argument as to why his state constitutional claims should be able to proceed when his federal claims cannot. Absent that, there is no declaration that this Court can offer and Plaintiff's state claims are dismissed for failure to state a claim. Likewise, the Complaint

---

[4] Plaintiff has also not requested that the Court take judicial notice.

[5] The Court does note, however, that the Texas Supreme Court's holding that "state agencies, like TxDOT here, are immune from suits under the UDJA unless the Legislature has waived immunity for the particular claims at issue" does not bode well for a potential declaratory judgment action against San Jac. *Texas Dep't of Transp. v. Sefzik*, 355 S.W.3d 618, 620 (Tex. 2011).

contains no factual allegations regarding Hellyer and so the Court cannot allow Plaintiff's claim for a declaratory judgment against her to survive.

## IV.   LEAVE TO AMEND

Federal Rule of Civil Procedure 15 provides that this Court "should freely give leave when justice so requires." *Cole v. Sandel Med. Indus., LLC.,* 413 Fed. App'x. 683, 688 (5th Cir. 2011) (quoting Fed. R. Civ. P. 15(a)(2)). In considering whether to grant leave to amend, the Court may weigh multiple factors, including undue delay, bad faith or dilatory motive, repeated failure to cure deficiencies, undue prejudice, and futility. *Wimm v. Jack Eckerd Corp.,* 3 F.3d 137, 139 (5th Cir. 1993); *see also United States ex rel. Steury v. Cardinal Health, Inc.*, 625 F.3d 262, 270 (5th Cir. 2010) (holding that denial of leave to amend may be appropriate when amendment would be futile); *Stripling v. Jordan Prod. Co., LLC*, 234 F.3d 863, 873 (5th Cir. 2000) (holding that a proposed amendment is futile if "the amended complaint would fail to state a claim upon which relief can be granted"). Though it has pointed out shortcomings that may not ultimately be capable of amelioration, the Court is not yet ready to say that amendment of Plaintiff's claims would be futile; it therefore grants leave to amend those claims within 20 days.

## V.    CONCLUSION

For the foregoing reasons, Defendants' Motion to Dismiss is **GRANTED**. Plaintiff's claims are dismissed *without prejudice*.

**IT IS SO ORDERED.**

**SIGNED** at Houston, Texas on this twelfth day of June, 2014.

/s/ Keith P. Ellison

**KEITH P. ELLISON**
**UNITED STATES DISTRICT COURT JUDGE**