UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| DALE LANGSTON | § | |
| | § | |
|    Plaintiff, | § | |
| | § | |
| v. | § | |
| | § | CIVIL ACTION NO. 4:13-cv-3035 |
| SAN JACINTO JUNIOR COLLEGE, ET AL., | § § | |
| | § | |
|    Defendants. | § | |

## MEMORANDUM & ORDER

Plaintiff Dale Langston has filed this lawsuit pursuit to 42 U.S.C. § 1983, alleging violations of the First and Fourteenth Amendments, as well as the Texas state constitution. He claims that he was unlawfully fired from his job at Defendant San Jacinto Community College because he complained of waste and fraud. Defendant has filed a Motion to Dismiss Plaintiff's Amended Complaint. (Doc. No. 18.) Having considered the submissions of the parties and the applicable law, Defendant's Motion is hereby **GRANTED**.

### I.    BACKGROUND[1]

San Jacinto Community College ("San Jac") is a public community college located in Pasadena, Texas. (Doc. No. 14-1 ¶ 2.) Plaintiff alleges that, in recent years, the college's facilities have begun to "show effects of corrosion." (*Id.* ¶ 15.) He notes, for instance, that a September 2006 report identified corrosion in the College's Central Campus Pipe System and that more of the same was discovered in November of that year. (*Id.* ¶¶ 16, 18.) The physical plants that were falling into decay were supervised by Ron Rucker and Bill Miller. (*Id.* ¶ 19.)

---

[1] For the purposes of a motion to dismiss, the Court takes Plaintiff's factual allegations as true. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007).

Langston was hired in 2007 and charged with overseeing the college's HVAC systems, implementing preventive maintenance for all campuses and offices, and supervising a staff of eleven. (*Id.* ¶¶ 20, 22.) Almost immediately upon being hired, Langston noticed that the Central Campus air handlers had fallen into premature disrepair, that San Jac's Mechanical Engineer knew about the problem but had not fixed it, and that the issue posed immediate safety risks. (*Id.* ¶¶ 23-25.) Langston drafted a letter to Underwriter's Laboratory and other involved parties "to enforce the vendor's replacement of the defective machines" but Miller would not permit Langston to send the letter. (*Id.* ¶ 26.) Miller also rejected Langston's suggestion for how best to fix the machines and instead asked an employee "to simply band the cracked metal shells of the air handlers." (*Id.* ¶ 27) He said that the air handlers would not be replaced until another bond election had taken place. (*Id.*)

In response, Langston told Miller that the air handlers posed a significant risk to life and that "the vendor should be held responsible because the air handlers were clearly failing due to defective construction materials." (*Id.* ¶ 28.) Miller informed Langston that his decision was final and Langston abided by that decision. (*Id.* ¶¶ 28-29.) At the end of the year, Langston received an "outstanding" performance review. (*Id.* ¶ 30.)

Langston continued to identify poorly engineered and defective components within the HVAC system, but Miller "was not appreciative." (*Id.* ¶¶ 31-32.) Langston supervised the remediation of any problem he discovered in his area of responsibility, but Miller was placing "monkey wrenches" to keep Langston from doing his job. (*Id.* ¶¶ 33-34.) Langston believed that Miller was trying to conceal fraud, waste, and/or inefficiency. (*Id.* ¶ 35.)

Langston spoke to Miller about his lack of cooperation, but Miller demurred. (*Id.* ¶ 36.) Langston reported the issues to Don Netherton, the College's Director of Maintenance. (*Id.* ¶ 37.)

Langston was then "suddenly and falsely cited by Miller's supervisor, Rou Rucker, for allegedly causing two employees to become ill from exposure to air conditioning refrigerant." (*Id.* ¶ 38.) Believing the allegations to be unfounded, and the illnesses fabricated, Langston disputed that charge. (*Id.* ¶ 39.)

Langston took a leave of absence to care for his injured wife in April 2009, and upon returning to work, he learned that the air handlers had failed. (*Id.* ¶¶ 40-41.) He continued to "identify haphazard procurement and work," becoming "an apparent thorn in the side of Rucker and Miller." (*Id.* ¶ 42.) Perhaps as a result, he was falsely accused of being involved in the theft of a motorcycle and had his work truck reassigned. (*Id.* ¶¶ 43.) Undaunted, Langston continued to locate malfunctioning equipment and arrange for its maintenance. (*Id.* ¶ 44.)

On July 25, 2010, Langston reported that "substandard work . . . had been deliberately performed contrary to his instructions." (*Id.* ¶ 44.) He also realized that the College's annual water treatment costs, paid to a company called NALCO, had increased from $28,000 to $200,000. (*Id.* ¶ 45.) And he learned that the College's air handling units were being faultily repaired by Gurry Air Conditioning, the College's vendor contractor. (*Id.* ¶ 45.) Langston believed "[t]he 'repairs' were not up to any reasonable specification of either product standard or remediation of defects, with metal block fractures being repaired with metal-bands and ratchet binders purchased from Harbor Freight supplier instead of welded metal strips." (*Id.* ¶ 45.)

Langston reported those facts, which he believed to be indicative of "waste and inefficiency" to Miller — who Langston believed to be a friend of Gurry Air Conditioning's Chuck Prangle — but Miller ignored that report. (*Id.* ¶ 45.) Langston then forwarded his report, along with photographs of the equipment and what he believed to be sham repairs, to the

3

College's Associate Vice Chancellor for Facilities and Construction, Bryan Jones. (*Id.* ¶ 46.) Soon thereafter, the College terminated its contract with Gurry Air Conditioning. (*Id.* ¶ 47.)

Langston "began to draw heightened criticism from Miller, who announced he was going to retire." (*Id.* ¶ 48.) Rucker was promoted as a result. (*Id.* ¶ 49.) On July 19, 2011, Langston was terminated. (*Id.* ¶ 53.) Langston has alleged that similar maintenance and facility problems persisted after he was fired. (*Id.* ¶¶ 56-60.)

Langston asserts that "[t]he circumstances and timing clearly establish that [he] was terminated for having raised concerns about Gurry Air Conditioning and other poor maintenance issues." (¶ 51.) He says that he "spoke out within the chain of command to protect the taxpayer's investments at San Jac" and that "[b]ecause of those expressions, he stepped on [the] toes of Rucker and Miller who had an apparent investment in keeping San Jac's vendors in place and not rocking the San Jac administrative boat." (*Id.* ¶¶ 58-59.) He adds that he "was harassed and terminated in order to obstruct his disclosure of Ricker's and Miller's poor oversight of waste and inefficiency in the expenditure of public monies." (*Id.* ¶ 60.)

Langston first filed this suit in the 215th District Court of Harris County in February 2013. (Doc. No. 1-1 at 2.) After Langston had twice amended his petition, Defendants removed to this Court in October 2013. (Doc. No. 1.) Defendants moved to dismiss the amended petition in February 2014. (Doc. No. 5.) The Court granted that motion in June, dismissing the case but giving Plaintiff an opportunity to replead. (Doc. No. 13.) Plaintiff missed the Court's original deadline for the amended pleading, but was granted the opportunity to file his complaint out of time. (Doc. No. 17.) The instant motion to dismiss followed. (Doc. No. 18.) Defendants have also filed a motion for summary judgment. (Doc. No. 29.)

4

## II. LEGAL STANDARD

A court may dismiss a complaint for a "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). "To survive a Rule 12(b)(6) motion to dismiss, a complaint 'does not need detailed factual allegations,' but must provide the plaintiff's grounds for entitlement to relief — including factual allegations that when assumed to be true 'raise a right to relief above the speculative level.'" *Cuvillier v. Taylor*, 503 F.3d 397, 401 (5th Cir. 2007) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). That is, a complaint must "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570). A claim has facial plausibility "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). The plausibility standard "is not akin to a 'probability requirement,'" though it does require more than simply a "sheer possibility" that a defendant has acted unlawfully. *Id.* Thus, a pleading need not contain detailed factual allegations, but must set forth more than "labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555 (citation omitted).

Ultimately, the question for the court to decide is whether the complaint states a valid claim when viewed in the light most favorable to the plaintiff. The court must accept well-pleaded facts as true, but legal conclusions are not entitled to the same assumption of truth. *Iqbal*, 556 U.S. at 678-79 (citation omitted). The court should not "'strain to find inferences favorable to the plaintiffs'" or "accept 'conclusory allegations, unwarranted deductions, or legal conclusions.'" *R2 Invs. LDC v. Phillips*, 401 F.3d 638, 642 (5th Cir. 2005) (quoting *Southland Sec. Corp. v. Inspire Ins. Solutions, Inc.*, 365 F.3d 353, 361 (5th Cir. 2004)). Importantly, the

court should not evaluate the merits of the allegation, but must satisfy itself only that the plaintiff has adequately pled a legally cognizable claim. *United States ex rel. Riley v. St. Luke's Episcopal Hosp.*, 355 F.3d 370, 376 (5th Cir. 2004).

### III. ANALYSIS

#### A. First Amendment Claim

Plaintiff made only a minimal attempt to replead his First Amendment complaint after his prior complaint was dismissed. In its decision dismissing Plaintiff's First Amendment claim, the Court held that Plaintiff's speech was not protected by the First Amendment because he was speaking as a college employee, not as a citizen. His speech regarding faulty repairs to the HVAC equipment was "within the chain of command" and concerned "the subject matter of his employment" — namely, the college's HVAC systems. *See* Mem. & Order, Doc. No. 13 at 7-8 (June 12, 2014). However, the Court observed that Plaintiff's allegation that he "noticed" rising water costs might have given rise to a First Amendment claim if Plaintiff had spoken out about the water costs and if water costs turned out not to be part of his ordinary job responsibilities.

In his repleaded complaint, the only change that Plaintiff made to his First Amendment allegations was to collapse five paragraphs of his original complaint into two paragraphs. *Compare* Pl.'s 2d Am. Pet. (Doc. No. 1-1 at 44-53), ¶¶ 45-49 *with* Am. Compl. (Doc. No. 14-1), ¶¶ 45-46. This makes it clear that he did in fact report the increased annual water treatment costs to his superior, Mr. Miller. However, Plaintiff does not allege that the water treatment costs were unrelated to the subject matter of his employment.[2] "[W]hen a public employee raises complaints

---

[2] Indeed, evidence attached to Defendant's Motion for Summary Judgment shows that Plaintiff could not so allege. The water treatment issue involved the treatment of water that ran through the college's HVAC systems – i.e., Mr. Langston's primary responsibility. *See* Langston Job Description, Ex. 2 to Langston Dep., Doc. No. 29-5 at 14; Dale Langston Dep., Doc. No. 29-5 at at 30:13-33:11 (explaining relationship of water treatment to HVAC operations).

or concerns up the chain of command at his workplace about his job duties, that speech is undertaken in the course of performing his job." *Davis v. McKinney*, 518 F.3d 304, 313 (5th Cir. 2008) (citing *Spiegla v. Hull*, 481 F.3d 961, 966 (7th Cir. 2007); *Battle v. Bd. of Regents*, 468 F.3d 755, 761 (11th Cir. 2006); *Foraker v. Chaffinch*, 501 F.3d 231 (3d Cir. 2007)). This is true even if the report is not required by his job. *Williams v. Dallas Independent School Dist.*, 480 F.3d 689, 694 (5th Cir. 2007); *see also Saldivar v. City of Alton, Tex.*, No. 7:12-cv-379, 2013 WL 5425992, at *3 (S.D. Tex. Sept. 26, 2013).

Plaintiff suggests that a recent Supreme Court case, *Lane v. Franks*, 134 S.Ct. 2369 (2014), supports his free speech claim. This argument is unavailing. In *Lane*, the Court held that a public employee who testified before a grand jury regarding corruption that he observed at work was protected by the First Amendment from retaliation related to his testimony. The Court observed that "[t]he critical question under *Garcetti* is whether the speech at issue is itself ordinarily within the scope of an employee's duties, not whether it merely concerns those duties," *id.* at 2379 (citing *Garcetti v. Ceballos*, 547 U.S. 410 (2006)), and concluded that grand jury testimony was not "within the scope of [plaintiff's] duties." But grand jury testimony — or indeed any speech outside of the employment context — is not at issue here. It is completely consistent with *Lane* to say that internal reports up the chain of command are "within the scope of an employee's duties," as post-*Garcetti* cases have uniformly held, while grand jury testimony is not. *See, e.g.*, *Davis*, 518 F.3d at 313.

Accordingly, the Court concludes that Plaintiff's Amended Complaint does not state a plausible claim for relief under the First Amendment.

### B. Due Process Claim

7

"To show a due process violation in the public employment context, the plaintiff must first show that she had a legally recognized property interest at stake." *Lollar v. Baker*, 196 F.3d 603, 607 (5th Cir. 1999). "A public employee has a property interest in her job if she has a legitimate claim of entitlement to it, a claim which would limit the employer's ability to terminate the employment." *Johnson v. Sw. Mississippi Reg'l Med. Ctr.*, 878 F.2d 856, 858 (5th Cir. 1989). Whether a public employee has such an interest turns on state law because "'[t]he Constitution does not create property interests; they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law." *Lollar*, 196, F.3d at 607 (quoting *Schaper v. City of Huntsville*, 813 F.2d 709 (5th Cir. 1987)).

In Texas, "absent a specific agreement to the contrary, employment may be terminated by the employer or the employee at will, for good cause, bad cause, or no cause at all." *Montgomery Cnty. Hosp. Dist. v. Brown*, 965 S.W.2d 501, 502 (Tex. 1998). "An agreement to modify the at-will employee status must be clear and explicit." *Cote v. Rivera*, 894 S.W.2d 536, 540 (Tex. App.-Austin 1995) (citing *Martinez v. Hardy*, 864 S.W.2d 767, 775 (Tex. App.-Houston [14th Dist.] 1993, no writ)).

In dismissing Plaintiff's prior complaint, this Court found that his due process claim failed because he has not actually included any allegations about the terms of his employment. *See* Mem. & Order, Doc. No. 13 at 10 (June 12, 2014). Plaintiff has remedied that defect in his Amended Complaint, which quotes liberally from several San Jac employment policies. Those policies 1) encourage employees to report fraud and prohibit retaliation against employees who report fraud, 2d Am. Compl. at 11, and 2) require college employees to "disclose waste, fraud, and corruption," *id.* at 14. According to Plaintiff, he relied on these policies — particularly the

8

policy prohibiting retaliation against employees who report fraud — and was terminated in contravention of the policies.

While the personnel policies that Langston quotes in his complaint do encourage the reporting of wrongdoing and prohibit retaliation, the same policies also state clearly that all employees continue to serve at the will of the Board of Trustees and that they have no property interest in their employment and may be terminated for any reason or no reason. *See* Policy for Employment of Non-Contracted Personnel, Defs.' Ex. 1 (Doc. No. 18-1). Where employee policies or handbooks expressly disclaim the creation of a contractual right to employment, Texas courts have held that such a disclaimer "negates the existence of any implied contractual rights." *Zenor v. El Paso Healthcare System, Ltd.*, 176 F.3d 847, 863 (5th Cir. 1999) (citing *Figueroa v. West*, 902 S.W.2d 701, 704 (Tex. App.-El Paso 1995)). In addition, Plaintiff has not pleaded any facts suggesting that there was an oral agreement specifically adopting the employment policies as a contractual element of the employment relationship, or a course of conduct showing that San Jac and its employees treated the handbook as a contract. *See Glagola v. North Texas Mun. Water Dist.*, 705 F. Supp. 1220, 1223 (E.D. Tex. 1989). Because there was no "clear and explicit" modification of Plaintiff's at-will status, Plaintiff lacked a property interest in his employment at San Jac, and his due process claim must be denied.

### C. Texas State Constitution Claim

Finally, Plaintiff seeks a declaratory judgment that his firing violates the Texas state constitution's free speech provision. In its earlier order, the Court dismissed those claims because "Plaintiff has not offered any argument as to why his state constitutional claims should be able to proceed when his federal claims cannot." *See* Mem. & Order, Doc. No. 13 at 11 (June

9

12, 2014). Plaintiff now cites to a number of cases generally stating that the Texas free speech clause is "more expansive" than the First Amendment.

There is another obstacle to Plaintiff's claims, however. Plaintiff's claim for declaratory judgment is brought under Texas's Uniform Declaratory Judgment Act. Texas law provides that "sovereign immunity bars UDJA actions against the state and its political subdivisions absent legislative waiver." *Texas Dep't of Transp. v. Sefzik*, 355 S.W.3d 618, 620 (Tex. 2011) (per curiam); *Texas Parks & Wildlife Dep't v. Sawyer Trust*, 354 S.W.3d 384, 388-89 (Tex. 2011). The legislature has not waived governmental immunity from declaratory judgment action claims based on alleged violations of the Texas Constitution. *See Ahmed v. Texas Tech Univ. Health Science Center School of Med.*, 2013 WL 265076, at *10 (Tex. App. – Amarillo 2013, no pet. history) (upholding dismissal of UDJA claim in which professor sought declaration that university violated Texas Constitution). Accordingly, Plaintiff's claims under the Texas Constitution must be dismissed.

Plaintiff also cannot bring a declaratory judgment claim against Brenda Hellyer, the College's chancellor. First, under federal law and Texas law, official capacity suits are the equivalent of an action against the governmental entity. See *Kentucky v. Graham*, 473 U.S. 159, 166 (1985); *DeMino v. Sheridan*, 176 S.W.3d 359, 365 (Tex. App. – Houston [1st Dist.] 2004, no pet.). Because Hellyer is named in her official capacity in Plaintiff's Complaint, the real defendant is the College and not Hellyer. See *Madrid v. Anthony*, 510 F. Supp. 2d 425, 427 n. 2 (S.D. Tex. 2007). As discussed above, a declaratory judgment claim against the College is barred by sovereign immunity. Second, the complaint makes no allegations regarding Hellyer, including no allegations that would bring the UDJA claim into the exception to state sovereignty for *ultra vires* actions.

## IV. CONCLUSION

The Court is always sensitive to the importance of gainful employment, and the anguish that often accompanies the loss of a job. Nonetheless, without doubting the sincerity of Mr. langston's pleas, the law simply affords him no redress. Defendants' Motion to Dismiss (Doc. No. 18) is **GRANTED**. Plaintiff's claims are dismissed with prejudice. Defendants' Motion for Summary Judgment (Doc. No. 29) is **DENIED** as moot.

**IT IS SO ORDERED.**

**SIGNED** at Houston, Texas on this 9th day of July, 2015.

_____
KEITH P. ELLISON
UNITED STATES DISTRICT JUDGE